William A. George v. Commissioner.
George v. Commissioner
Docket No. 92517.
United States Tax Court
T.C. Memo 1963-326; 1963 Tax Ct. Memo LEXIS 20; 22 T.C.M. (CCH) 1708; T.C.M. (RIA) 63326; December 17, 1963
*20 1. Held, that petitioner derived unreported taxable income for each of the years here involved. Amounts of such unreported income determined. 2. Held, that petitioner is chargeable with an addition to tax under section 294(d)(1)(A) of the 1939 Code for each of the years 1950 and 1951, for failure to file a declaration of estimated tax; and that he is chargeable with an addition to tax under section 294(d)(2) of said Code for each of the years 1952 through 1954, for substantial underestimate of estimated tax. 3. Held, that at least part of the deficiency for each of the years involved is due to fraud with intent to evade tax; and accordingly that petitioner is chargeable with an addition to tax for each of said years, under section 293(b) of the 1939 Code or under section 6653(b) of the 1954 Code. 4. Held, that petitioner's income tax return for each of the taxable years involved was false or fraudulent with intent to evade tax; and that assessment and collection of the deficiency and additions to tax for each of these years are not barred by the statute of limitations. Section 276(a) of the 1939 Code and section 6501(c)(1) of the 1954 Code. Richard G. Maloney, 80 Federal St., Boston, *21 Mass., for the petitioner. Robert B. Dugan and John R. Berman, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The Commissioner determined deficiencies against petitioner in income taxes and additions to tax as follows: [1]
Additions to Tax
Taxable
Sec. 294
Sec. 294
Year
Deficiency
Sec. 293(b)
Sec. 6653(b)
(d)(1)(A)
(d)(2)
1950
$ 2,695.25
$ 1,347.62
$289.05
1951
2,865.82
1,432.91
327.11
1952
30,133.44
15,066.72
$1,803.34
1953
17,579.54
8,789.77
1,071.87
1954
30,897.99
$15,448.99
1,922.43
The issues for decision are: 1. Whether the petitioner derived unreported taxable income for each of the years involved. 2. Whether for each of the years 1950 and 1951, petitioner is chargeable with an addition to tax under section 294(d)(1)(A) for failure to file a declaration of estimated tax; and whether for each of the years 1952 through 1954, he is chargeable with an addition to tax under section 294(d)(2) for substantial underestimate of estimated tax. 3. Whether part of any deficiency for any of the years involved *22 is due to fraud with intent to evade tax. 4. Whether assessment and collection of any deficiency or addition to tax for any of the years involved are barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated. All stipulations of facts and all exhibits therein identified are incorporated herein by reference. General Facts Petitioner, William A. George, is an unmarried person. He filed a timely individual income tax return for each of the taxable years involved, with the collector or district director of internal revenue at Boston. Petitioner's parents were immigrants from Lebanon, and his father was a shoeworker in a factory at Brockton, Massachusetts. At all times material including each of the taxable years involved, petitioner lived with his parents and several of his brothers and sisters in the family home in Brockton. Petitioner graduated from high school in 1937, and thereafter until 1943 he was a student, first at Boston College, and then at the University of Loyola in Chicago and the Chicago College of Dental Surgery. In the latter year, he received both a degree of Bachelor of Science from Loyola, and a degree of Doctor of Dental Surgery *23 from said dental college. From July 1943 until sometime in 1945, he served on active duty in the United States Navy. In 1945, after termination of his Naval service, petitioner commenced the private practice of dentistry in Brockton. His first dental office, which he continued to occupy through the year 1951, was located in leased premises; and it consisted of a reception room, and an operating room equipped with one dental chair, an x-ray machine, and miscellaneous dental equipment - all purchased largely on credit. During said period he employed no nurse or professional assistant, but his sister Margaret helped him in keeping the office books and records. Summary descriptions of petitioner's income tax returns for the years 1945 through 1950, and also the amounts of income taxes which he paid for said years, are as follows: Total
Year
Description of return * *24 tax paid
1945
Nonassessable return filed
None
1946
Full-paid return filed; deficiency later assessed
$305.00
1947
Return claimed refund re $198 estimated tax; deficiency
later assessed
596.00
Total
Year
Description of return *
tax paid
1948
Nonassessable return filed
None
1949
Returned: Net profit from dental practice
$1,522.21
Net loss from operation of fishing boat
1,173.78
None
1950
Returned: Net profit from dental practice
$1,210.44
429.67
Total net income
3,607.94
During the year 1951, petitioner began to expend substantial sums on the stock market for the purchase of corporate stocks; and from year to year thereafter including the taxable years here involved, his activity in this regard increased. As of the close of the year 1951, which was the first year in which it is disclosed that he owned corporate stocks, his total investment cost in such stocks was $9,209.37. At the close of 1952, his investment cost in stocks had increased to $22,369.23. At the close of 1953, his stock investment costs had further increased to $92,371.47. And at the close of 1954, his investment costs in stocks was $83,571.45. During these same years, the amounts of petitioner's liabilities to banks on loans, *25 and to brokerage firms on margin accounts, increased from a total of $19,983 at the close of 1951 to a total of $46,941 at the close of 1952; further increased to $107,853 at the close of 1953, and were $50,963 at the close of 1954. Also during 1951 and 1952, petitioner expended substantial sums for improvement of his professional facilities. In 1951, he purchased a building site in Brockton. And then in 1952, he erected thereon an 8 or 9 room dental clinic building; moved his dental offices into part of this building; and equipped the same with four additional dental chairs, together with various other new items of dental equipment. The amounts which he expended for these new facilities were as follows: Lot - $5,000; dental building - $40,000; additional dental chairs and equipment - $10,000. [2]
The amounts and sources of petitioner's adjusted gross income for said years 1951 through 1954, as reported by him on his income tax returns, and also the amounts of income tax which he paid for these years, were as follows: Adjusted gross income as reported
Income
Year
Amount
Source
tax paid
1951
$4,921.58
$4,816.58 from dental practice
$ 670.53
448.50 from dividends
( 343.50) - capital loss from security trans-
actions
1952
5,521.61
$4,295.44 from dental practice
817.20
682.50 from dividends
544.07 - capital gain from security trans-
actions
1953
8,063.12
$8,860.08 from dental practice
1,102.13
477.00 from dividends
(1,273.96) - capital loss from security trans-
actions
1954
9,660.67
$1,400.28 from dental practice
1,942.56
2,548.75 from dividends
5,711.64 - capital gain from security trans-
actions
*26 Petitioner continued to carry on his dental practice in the new clinic building until some time in 1957; and he then sold both the building and his dental equipment, and entirely ceased to practice as a dentist. From then on, he had no office, and his principal activities were engaging in security transactions. In 1957 the amounts of his sales of stocks acquired in that year and in the preceding year only, totaled $380,452.15. Facts re respondent's computation of petitioner's gross income for 1950 through 1954 by net worth method In 1959 a revenue agent examined petitioner's income tax return for the year 1957, in which petitioner had claimed a substantial loss from the sale of his dental clinic building, the land thereunder, and all his dental equipment - most of which he reported in his 1957 return as having been acquired in 1952 at costs totaling $65,000. The revenue agent, in attempting to verify such claimed costs in 1952, became interested in determining how petitioner could have obtained the funds with which to meet such costs, in view of the small amounts of income which he had reported on his returns for 1952 and all preceding years. Accordingly, the agent arranged conferences *27 with petitioner, at which he requested an explanation of the source of such funds; and also for the same purpose, he had other conferences with a certified public accountant whom petitioner designated to represent him. These conferences failed to yield a satisfactory explanation. Thereupon the revenue agent broadened his investigation to cover all earlier years for which petitioner had filed income tax returns, including the taxable years 1950 through 1954 which are here involved; and he also caused a special agent from the intelligence division of the internal revenue service to enter the investigation. This special agent held further conferences with petitioner and his accountant. After such actions had likewise failed to solve the problem, the revenue agent resumed his examination of petitioner's professional accounts and other sources of income for the taxable years here involved; investigated all known bank accounts and brokers' accounts which had been maintained during said years in the names of petitioner and members of his family; and then prepared a net worth statement which reflected all assets and liabilities of petitioner for said years which had been discovered. The end *28 result of the foregoing was that, under date of March 2, 1961, the Commissioner issued his notice of deficiency herein; and he therein determined the above-mentioned deficiencies and additions to tax for the taxable years here involved, by use of the net worth and nondeductible expenditures method. A summary of the net worth statement which the respondent so used in determining said liabilities (petitioner's Exhibit 6) is as follows: 1-1-50
12-31-50
12-31-51
ASSETS
Savings Accounts, Including: Held by petitioner individually
or jointly
Campello Acct. No. 15786
Holbrook Acct. No. 3827
Randolph Acct. No. 6142
$23,000.00
$30,157.60
$36,994.80
Held in name of family mem-
bers -
Campello accounts Nos. 15929-
15936
Checking account
9.07
Accounts receivable: From Margaret (sister)
From Michael (brother)
Corporate stocks
10,501.80
Realty: Dental building
Dental building - land
5,000.00
Avon land
Dental equipment and fixtures
7,000.00
9,743.26
10,000.00
Automobile
1,000.00
1,000.00
1,000.00
Total Assets
$31,000.00
$40,900.86
$63,505.67
LIABILITIES
Margin Account: E. F. Hutton & Co.
Notes payable: Brockton Nat'l Bank
$ 5,000.00
Holbrook Coop. Bank
3,700.00
Home Nat'l Bank
4,050.00
Peoples Savings Bank
Reserve for depreciation
$ 2,800.02
$ 3,380.98
4,233.34
Total Liabilities
$ 2,800.02
$ 3,380.98
$16,983.34
Net Worth
$28,199.98
$37,519.88
$46,522.33
Net worth beginning of year
28,199.98
37,519.88
Increase in net worth
$ 9,319.90
$ 9,002.45
Add: Income tax paid
429.67
Add: Personal living expenses
5,000.00
5,000.00
$14,319.90
$14,432.12
Less: Nontaxable capital gains
542.17
Less: Dividend exclusion
Adjusted Gross Income as Corrected
$14,319.90
$13,889.95
Adjusted Gross Income per Returns
4,210.44
4,921.58
Understatement of Adjusted Gross
$10,109.46
$ 8,968.37
Income
*29 12-31-52
12-31-53
12-31-54
ASSETS
Savings Accounts, Including: Held by petitioner individually
or jointly
Campello Acct. No. 15786
Holbrook Acct. No. 3827
Randolph Acct. No. 6142
$ 43,128.80
$ 49,804.00
Held in name of family mem-
bers -
Campello accounts Nos. 15929-
15936
Checking account
554.22
4,524.27
$ 3.98
Accounts receivable: From Margaret (sister)
5,246.00
10,918.00
From Michael (brother)
13,147.69
Corporate stocks
25,507.88
98,223.23
123,753.36
Realty: Dental building
40,000.00
40,000.00
50,000.00
Dental building - land
5,000.00
5,000.00
5,000.00
Avon land
3,900.00
Dental equipment and fixtures
20,000.00
20,000.00
21,457.90
Automobile
1,000.00
1,000.00
1,000.00
Total Assets
$135,190.90
$223,797.50
$229,180.93
LIABILITIES
Margin Account: E. F. Hutton & Co.
$ 31,166.55
$ 22,881.36
Notes payable: Brockton Nat'l Bank
$ 12,064.00
30,538.70
Holbrook Coop. Bank
6,900.00
6,900.00
Home Nat'l Bank
4,950.00
8,500.00
Peoples Savings Bank
10,000.00
9,500.00
8,900.00
Reserve for depreciation
5,567.10
8,899.32
16,072.29
Total Liabilities
$ 39,481.10
$ 95,504.57
$ 47,853.65
Net Worth
$ 95,709.80
$128,292.93
$181,327.28
Net worth beginning of year
46,522.33
95,709.80
128,292.93
Increase in net worth
$ 49,187.47
$ 32,583.13
$ 53,034.35
Add: Income tax paid
670.53
817.20
1,102.13
Add: Personal living expenses
5,000.00
6,000.00
6,000.00
$ 54,858.00
$ 39,400.33
$ 60,136.48
Less: Nontaxable capital gains
159.03
1,044.69
Less: Dividend exclusion
50.00
Adjusted Gross Income as Corrected
$ 54,698.97
$ 39,400.33
$ 59,041.79
Adjusted Gross Income per Returns
5,521.61
8,063.12
9,660.67
Understatement of Adjusted Gross
$ 49,177.36
$ 31,337.21
$ 49,381.12
Income
*30 Facts re adjustments to respondent's net worth statement At the trial of this case, counsel for the parties filed a stipulation regarding certain facts; and they incorporated therein a partial (but incomplete) statement of assets and liabilities of petitioner for the taxable years here involved. The effect of this partial statement was to adjust by agreement, the amounts of many (but not all) of the items of assets and liabilities which the respondent had included in his above-mentioned net worth statement. A summary of this agreed partial statement of assets and liabilities (Exhibit 2-B) is as follows: 1-1-50
12-31-50
12-31-51
ASSETS
Savings Accounts: Campello Acct. No. 15786
$ 1,909.60
$ 2,352.00
$ 2,852.00
Holbrook Acct. No. 3827
3,610.00
4,604.80
5,512.80
Randolph Acct. No. 6142
3,463.20
4,384.80
5,341.60
Checking account
147.76
464.27
9.07
Corporate stocks
9,209.37
Realty: Dental building
Dental building - land
5,000.00
Avon land
Dental equipment and fixtures
7,000.00
9,743.26
10,000.00
Automobile
1,000.00
1,000.00
1,000.00
Totals
$17,130.56
$22,549.13
$38,924.84
LIABILITIES
Margin Account: E. F. Hutton & Co.
R. J. Buck Co.
Notes payable: Brockton Nat'l Bank
$ 5,000.00
Holbrook Coop. Bank
3,700.00
Home Nat'l Bank
4,050.00
Peoples Savings Bank
Middlesex County Nat'l Bank
S. S. White-Reynolds
$ 173.26
Reserve for depreciation
$ 2,800.02
3,380.98
4,233.34
Totals
$ 2,800.02
$ 3,554.24
$16,983.34
*31 12-31-52
12-31-53
12-31-54
ASSETS
Savings Accounts: Campello Acct. No. 15786
$ 3,368.40
$ 3,872.80
Holbrook Acct. No. 3827
6,510.40
7,504.80
Randolph Acct. No. 6142
6,335.20
7,364.00
Checking account
554.22
4,524.47
$ 3.98
Corporate stocks
22,369.23
92,371.47
83,571.45
Realty: Dental building
27,920.68
27,920.68
30,540.22
Dental building - land
5,000.00
5,000.00
5,000.00
Avon land
3,700.00
Dental equipment and fixtures
20,000.00
20,000.00
21,457.90
Automobile
1,000.00
1,000.00
1,000.00
Totals
$ 93,058.13
$169,558.02
$145,273.55
LIABILITIES
Margin Account: E. F. Hutton & Co.
$ 31,166.55
$ 22,881.36
R. J. Buck Co.
12,348.15
3,109.09
Notes payable: Brockton Nat'l Bank
$ 12,064.00
30,538.70
Holbrook Coop. Bank
6,900.00
6,900.00
Home Nat'l Bank
4,950.00
8,500.00
Peoples Savings Bank
10,000.00
9,500.00
8,900.00
Middlesex County Nat'l Bank
450.50
S. S. White-Reynolds
7,009.24
Reserve for depreciation
5,567.10
8,899.32
16,072.29
Totals
$ 46,940.84
$107,852.72
$ 50,962.74
Also at the trial herein, evidence was presented with regard to the following disputed assets and liabilities, which one party or the other contended should either be included among or be eliminated from the items which the respondent had included in his net worth statement. The facts regarding *32 such disputed items are as follows. Fishing Vessel On January 1, 1950, petitioner owned a fishing vessel which had a value of $15,000. He had acquired the same in 1946 at a cost of $12,000, of which he borrowed $2,000 from his sister Mary and $1,500 from his brother Abraham. On February 27, 1950, petitioner sold this fishing vessel for $15,000. His adjusted basis for the vessel at that time was $13,904.28; and the amount of profit which he derived from the sale was $1,095.72. He did not report either said sale or his profit therefrom on his 1950 income tax return; and the fact that the sale had been made was not disclosed to the respondent until about the time of the trial herein, which was subsequent to the preparation of respondent's net worth statement. The purchaser of the vessel paid $11,000 in cash, as part of the purchase price, at the time of the sale; paid $1,500 in 1951; paid another $1,500 in 1952; and in 1953 discharged his remaining $1,000 liability by making an agreed reduced payment of $500. Of the $11,000 initial cash payment petitioner paid $2,000 to his sister Mary and $1,500 to his brother Abraham, in discharge of the loans which they had made to him at the time *33 he acquired the vessel; and he placed the balance of $7,500 in his safe deposit box at the Brockton National Bank. Based on the foregoing, we find as a fact that petitioner had on the dates hereinafter indicated, the following assets and liabilities which were not included in respondent's net worth statement: Additional Assets
1/ 1/50
Fishing vessel
$15,000
12/31/50
Account receivable from pur-
chaser
4,000
12/31/51
Account receivable from pur-
chaser
2,500
12/31/52
Account receivable from pur-
chaser
1,000
Additional Liabilities
1/ 1/50
Account payable to Mary (sis-
ter)
2,000
1/ 1/50
Account payable to Abraham
(brother)
1,500 As regards the $7,500 placed in the safe deposit box, this is dealt with in our following consideration of the contents of that box. Cash and Bonds in Safe Deposit Box During the year 1950, petitioner had the previously mentioned safe deposit box at the Brockton National Bank, which he had originally rented in 1946. On January 1, 1950, the following items were held by him in this box: $5,600 in cash which he had received in 1948 from liquidation of a mutual investment fund; $1,000 in cash which he had received in 1948 as a forfeited deposit from a prospective purchaser of his fishing *34 vessel; $2,500 in cash which he had received in 1948 in settlement for personal injuries and for damages to his automobile as the result of an accident; and United States Savings Bonds having a value of $4,000, which he had previously acquired. Thereafter in February 1950, the petitioner added to the amounts thus held in his safe deposit box by placing therein the above-mentioned amount of $7,500 which was part of the initial payment received on the sale of his fishing vessel. Petitioner, in presenting evidence with respect to the contents of said box, neither contended nor produced any evidence which tends to indicate that any of the above-mentioned accumulated assets were either removed from the box or disposed of by him during any of the taxable years here involved. Based on the foregoing, we find as a fact that petitioner had on the dates hereafter indicated, the following additional assets which were not included in the respondent's net worth statement: 1/ 1/50
Cash and bonds in safe de-
posit box
$13,100
12/31/50
Cash and bonds in safe de-
posit box
20,600
12/31/51
Cash and bonds in safe de-
posit box
20,600
12/31/52
Cash and bonds in safe de-
posit box
20,600
12/31/53
Cash and bonds in safe de-
posit box
20,600
12/31/54
Cash and bonds in safe de-
posit box
20,600
Savings *35 Accounts in Names of Family Members In May 1946, eight separate savings accounts (also designated as "series share accounts") were opened at the Campello Cooperative Bank in the respective names of petitioner's father, his mother, and six of his brothers and sisters. Each of these simultaneously opened accounts was for 40 "savings shares" which called for minimum deposits of $40 per month, which was the maximum size account permitted under the state law governing cooperative banks. Thereafter until these accounts were finally closed in 1953 and 1954 as hereinafter shown, deposits in the amount of $40 per month were regularly made in each of these accounts. The name, relationship to petitioner, age, and principal occupation of each of the family members in whose names these accounts were maintained, are as follows: Relation-
Principal Occupation
ship to
Age
Name
petitioner
1946
1946-1949
1950-1954
Manthaia, Jr.
Brother
10
Student
Student
Arlena
Sister
14
Student
Sales clerk
Michael
Brother
17
Student
Student * *36 Margaret
Sister
24
Assisted petitioner
Assisted petitioner **
Joseph
Brother
21
Meat packer and
shoeworker
Mary
Sister
32
Hairdresser
Housewife
Mantura
Mother
50
Housewife
Housewife
Manthala
Father
53
Shoeworker
Shoeworker
Petitioner from time to time furnished part of the monthly deposits for the accounts in the names of the younger children. In 1948 Mary was married; and thereupon the account which had theretofore been maintained in her name was changed into a joint account bearing the names of her and petitioner. In 1946 and also during all the years 1951 to 1954, petitioner used the passbooks for all eight savings accounts as collateral security for his own personal bank loans. On December 30, 1953, the account maintained in the name of Manthala, Jr., was closed; in April 1954, all the other accounts except that in the name of Margaret were closed; and in June 1954, this remaining account in the name of Margaret was also closed. At the times when the accounts were so closed, the bank paid thereon the following amounts: Name in Which Account
Amount
Was Maintained
Paid
Manthala, Jr.
$4,274.80
Arlena
4,520.80
Michael
4,520.80
Joseph
4,520.80
Margaret
4,359.25
Mary
4,520.80
Mantura
4,520.80
Manthala
4,520.80 All of these amounts except the $4,359.25 paid on the account in the name of Margaret, were used by petitioner to reduce the amounts of his personal loans from other *37 banks. Up to the time of the trial herein, petitioner had not repaid any of said amounts to the family members; he had not paid any interest to any of them on said amounts; and he had not delivered to them any note or other evidence of indebtedness for said amounts. Also in net worth statements for the subsequent years 1955 and 1956, which petitioner submitted to respondent, no indebtedness to family members was included. As regards the above amount which the bank paid upon the closing of the account maintained in the name of Margaret, this was applied by petitioner to reduce the amount of a loan of $5,246 (hereinafter mentioned) which he had previously made to Margaret in February 1953. Based on the evidence received with regard to said savings accounts maintained in the names of family members, we find as facts (although not without considerable doubt) that none of said savings accounts was an asset of petitioner at either the beginning or the close of any of the taxable years here involved; that at the close of each of the years 1953 and 1954, petitioner had a liability to Manthala, Jr., in the amount of $4,274.80; and that at the close of the year 1954 he had a liability to each *38 of the other above-mentioned family members except Margaret, in an amount equal to the proceeds of their respective savings accounts which he received and applied for his own benefit. In the above-mentioned net worth statement of the respondent, all of said family savings accounts were included as assets of the petitioner among his total savings accounts as of the beginning of the year 1950 and the close of all years 1950 through 1953; and the above-mentioned liabilities to family members at the close of the years 1953 and 1954 were not included among petitioner's liabilities. Facts re accounts receivable from Margaret (sister) and Michael (brother) In February 1953, 200 shares of R.C.A. stock were purchased at a cost of $5,246, in an account under the name of petitioner's sister Margaret with E. F. Hutton & Company. At that time Margaret was working as an assistant to petitioner. Petitioner supplied all the funds for the above purchase, and no portion of the same was repaid to him until the year 1954. In the latter year, 400 shares of McWilliams Dredging Company stock also were purchased for said account, entirely on margin and at a cost of $5,672. At the close of the year 1954, *39 said account showed stocks therein which had a total cost of $10,918, and margin liability to the broker of $5,761.50. The respondent in his above-mentioned net worth statement included among petitioner's assets as "Loan Receivable - stock * * * Margaret," the amounts of $5,246 as of December 31, 1953, and $10,918 as of December 31, 1954. In December 1954, an account was opened with E. F. Hutton & Company in the name of petitioner's brother Michael; and 300 shares of Bullard Company stock were purchased for the account at a price of $13,147.69. At that time Michael was a student who had no previous experience with the stock market. Petitioner controlled the account and furnished $7,000 of the purchase price, and the balance of the price was carried by the broker on margin. None of said $7,000 was repaid to petitioner during the year 1954. The respondent in his above-mentioned net worth statement included among petitioner's assets as "Loan Receivable - stock, Michael," the amount of $13,147.69 as of December 31, 1954. Based on the evidence presented herein, we find as facts that none of the stocks held in the above brokerage accounts was at any time an asset of petitioner; and that *40 the correct amounts of the accounts receivable owing to petitioner by Margaret and Michael were as follows: 12/31/53
Account receivable from Mar-
garet (sister)
$5,246
12/31/54
Account receivable from Mi-
chael (brother)
7,000
Facts re petitioner's personal living expenses The respondent, in the net worth statement attached to his notice of deficiency herein, determined that the amounts of petitioner's nondeductible living expenses for the taxable years here involved were $5,000 for each of the years 1950 through 1952, and $6,000 for each of the years 1953 and 1954. The evidence presented herein with respect to the amounts of such expenses related to only three items, i.e.: Unsupported estimates of contributions made toward the cost of operating the family home; cost of insurance only on an automobile; and cost of a daily newspaper. For the year 1956 petitioner represented the amount of his personal living expenses to be $7,800. The personal living expenses of the petitioner for each of the taxable years involved were not less than the amounts determined by the respondent. [3] *41 Assets
1-1-50
12-31-50
12-31-51
Cash and bonds in safe de-
posit box
$13,100.00
$20,600.00
$20,600.00
Checking account
147.76
464.27
9.07
Savings accounts: Campbello Bank #15786
1,909.60
2,352.00
2,852.00
Randolph Bank #6142
3,463.20
4,384.80
5,341.60
Holbrook Bank #3827
3,610.00
4,604.80
5,512.80
Accounts receivable: From Margaret (sister)
From Michael (brother
Fishing vessel
15,000.00
Account receivable from sale
of fishing vessel
4,000.00
2,500.00
Corporate stocks
9,209.37
Dental building
Equipment and fixtures
7,000.00
9,743.26
10,000.00
Land under dental building
5,000.00
Land - Avon
Automobile
1,000.00
1,000.00
1,000.00
Total Assets
$45,230.56
$47,149.13
$62,024.84
Liabilities
Accounts payable: Middlesex County National
Bank
S. S. White-Reynolds
$ 173,26
Abraham (brother)
$1,500.00
Manthala, Jr. (brother)
Arlena (sister)
Michael (brother)
Joseph (brother)
Mary (sister)
2,000.00
Mantura (mother)
Manthala (father)
Margin Accounts: E. F. Hutton & Co.
R. J. Buck Co.
Notes payable: Peoples Savings Bank
Brockton National Bank
$ 5,000.00
Home National Bank
4,050.00
Holbrook Coop. Bank
3,700.00
Reserve for depreciation
2,800.02
3,380.98
4,233.34
Total Liabilities
$ 6,300.02
$ 3,554.24
$16,983.34
Total Assets less Total
Liabilities
$38,930.54
$43,594.89
$45,041.50
*42 Assets
12-31-52
12-31-53
12-31-54
Cash and bonds in safe de-
posit box
$ 20,600.00
$ 20,600.00
$ 20,600.00
Checking account
554.22
4,524.47
3.98
Savings accounts: Campbello Bank #15786
3,368.40
3,872.80
Randolph Bank #6142
6,335.20
7,364.00
Holbrook Bank #3827
6,510.40
7,504.80
Accounts receivable: From Margaret (sister)
5,246.00
From Michael (brother
7,000.00
Fishing vessel
Account receivable from sale
of fishing vessel
1,000.00
Corporate stocks
22,369.23
92,371.47
83,571.45
Dental building
27,920.68
27,920.68
30,540.22
Equipment and fixtures
20,000.00
20,000.00
21,457.90
Land under dental building
5,000.00
5,000.00
5,000.00
Land - Avon
3,700.00
Automobile
1,000.00
1,000.00
1,000.00
Total Assets
$114,658.13
$195,404.22
$172,873.55
Liabilities
Accounts payable: Middlesex County National
Bank
$ 450.50
S. S. White-Reynolds
7,009.24
Abraham (brother)
Manthala, Jr. (brother)
$ 4,274.80
$ 4,274.80
Arlena (sister)
4,520.80
Michael (brother)
4,520.80
Joseph (brother)
4,520.80
Mary (sister)
4,520.80
Mantura (mother)
4,520.80
Manthala (father)
4,520.80
Margin Accounts: E. F. Hutton & Co.
31,166.55
22,881.36
R. J. Buck Co.
12,348.15
3,109.09
Notes payable: Peoples Savings Bank
10,000.00
9,500.00
8,900.00
Brockton National Bank
12,064.00
30,538.70
Home National Bank
4,950.00
8,500.00
Holbrook Coop. Bank
6,900.00
6,900.00
Reserve for depreciation
5,567.10
8,899.32
16,072.29
Total Liabilities
$ 46,940.84
$112,127.52
$ 82,362.34
Total Assets less Total
Liabilities
$ 67,717.29
$ 83,276.70
$ 90,511.21
*43 Ultimate Findings of Fact Petitioner's assets and liabilities as of the beginning of the year 1950 and the close of each of the taxable years here involved were as follows: The following are the amounts of petitioner's net worth (i.e., total assets less total liabilities) as of the close of each of the taxable years involved; the amounts of the increases in his net worth for said years; the amounts of the adjustments per year for income taxes paid, nondeductible living expenses, nontaxable portion of capital gains, and dividend exclusion; and the correct amount of petitioner's adjusted gross income for each of the taxable years, as computed by the net worth and nondeductible expenditures method: Add
Less
Increase
Nondeductible
Capital
Correct
Taxable year
Net worth
in net
living
gains and
adjusted
ended
at close
worth over
expenses and
dividend
gross
December 31
of year
previous year
income tax
exclusion
income
1950
$43,594.89
$ 4,664.35
$5,000.00
$ 9,664.35
1951
45,041.50
1,446.61
5,429.67
$ 542.17
6,334.11
1952
67,717.29
22,675.79
5,670.53
159.03
28,187.29
1953
83,276.70
15,559.41
6,817.20
22,376.61
1954
90,511.21
7,234.51
7,102.13
1,094.69
13,241.95 The following is a summary of the amounts of petitioner's correct adjusted gross *44 income for the respective taxable years involved; the amounts of such income reported on petitioner's income tax returns for said years; and the amounts of the understatements of income for said years: Adjusted gross
Taxable
income as
Reported
Understate-
year
found above
on return
ment
1950
$ 9,664.35
$4,210.44
$ 5,453.91
1951
6,334.11
4,921.58
1,412.53
1952
28,187.29
5,521.61
22,665.68
1953
22,376.61
8,063.12
14,313.49
1954
13,241.95
9,660.67
3,581.28
At least part of the deficiency for each of the taxable years here involved was due to fraud with intent to evade tax. Petitioner's income tax return for each of the taxable years here involved was false or fraudulent with intent to evade tax; and assessment and collection of the deficiency and additions to tax for each of these years are not barred by the statute of limitations. Opinion All the issues presented for decision herein involve primarily questions of fact, to be resolved from a consideration and weighing of all the evidence. We have hereinabove in our Findings of Fact, set forth the material and pertinent facts which have been established by the evidence; and we believe that no useful purpose would be served by restating the same here. As regards the *45 first two issues, the Commissioner's determinations as to the amounts of the deficiencies in tax and the additions to tax for the years involved are prima facie correct; and the burden of establishing error in such determinations (regardless of the nature of other issues involved) was on the petitioner. And as to the two other issues involving the existence of fraud, the burden of establishing such fraud was on the Commissioner, as provided by section 1112 of the 1939 Code and section 7454(a) of the 1954 Code. 1. The first issue, as above stated, is whether the petitioner derived unreported taxable income for each of the taxable years 1950 through 1954. The Commissioner determined that he did derive unreported income for all of these years; and he based such determination on use of the so-called net worth and nondeductible expenditures method. The use of such method has been employed with approval in numerous cases; and the Supreme Court has recognized that its use is proper even in situations where the taxpayer has books that do not appear on their face to be inadequate - for books may be "more consistent than truthful." See . In our Findings *46 of Fact we have made several adjustments to the items included by the respondent in his net worth statement. Most of these adjustments were made pursuant to stipulation of the parties. Others were made with respect to disputed items; and these disputes have been resolved by us after consideration of all the evidence relating thereto. Most of said adjustments were in favor of the petitioner. In our ultimate findings of fact, we took cognizance of said adjustments; and we are convinced that the amounts of petitioner's assets and liabilities as adjusted by us are correct for all years involved, on the basis of the evidence of record. We hold, in accordance with our ultimate findings of fact, that petitioner had unreported income for the following years and in the following amounts: Year
Amount
1950
$ 5,453.91
1951
1,412.53
1952
22,665.68
1953
14,313.49
1954
3,581.28
2. The second issue is whether the petitioner is chargeable with additions to tax under section 294(d)(1)(A) of the 1939 Code for the years 1950 and 1951 for failure to file declarations of estimated tax, and under section 294(d)(2) for the years 1952 through 1954 for substantial underestimate of estimated tax. The respondent determined *47 in his notice of deficiency that petitioner is chargeable with such additions to tax; and since the petitioner failed to offer any evidence on this issue, we approve the Commissioner's determination as to such additions to tax, except to the extent of any modifications automatically necessary by reason of our revisions to the net worth statement. 3. The third issue hinges on whether the Commissioner has sustained his burden of establishing that the deficiency in tax for each of the years involved is due to fraud with intent to evade tax. It should be observed in this regard, that in order for the Commissioner to prove fraud by clear and convincing evidence, he does not have to prove that all the deficiency for each year is due to fraud. Rather, the statutory requirement is that "If any part of any deficiency is due to fraud with intent to evade tax" (emphasis supplied), then the 50 percent addition should apply. See section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code. To establish fraud by direct evidence is seldom possible; it usually must be gleaned from the surrounding circumstances. . In , in which the *48 Supreme Court affirmed a conviction for fraudulent evasion of income tax computed under the net worth method, the Court declared (at page 139) that "evidence of a consistent pattern of underreporting large amounts of income" will support "an inference of willfulness." Likewise in , affirming so far as pertinent a Memorandum Opinion of this Court, the Court of Appeals said: Even if this case were devoid of the usual indicia of fraud, the consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent. See ; (C.A. 4, 1955), * * * Also the Court of Appeals for the Sixth Circuit in , held that "The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade." To the same effect see: ; , , affd. (C.A. 6) ; , *49 affirming a Memorandum Opinion of this Court, and , affirming a Memorandum Opinion of this Court. Also in , affirming a Memorandum Opinion of this Court, the Court of Appeals said that consistent substantial understatement of income for several years "is highly persuasive evidence of intent to defraud the government." In the instant case, we have substantial and consistent understatements of income for all 5 years involved. Petitioner is a highly intelligent, highly educated, and obviously astute professional man. He, together with his sister Margaret, kept his books of account; and we are convinced that during the period when he was making large investments in the stock market, utilizing large amounts for the improvement of his professional facilities, and creating large liabilities for bank loans and margin accounts with brokers, he must have known that the amounts of his income were greater than the considerably smaller amounts which he was reporting on his income tax returns. It would seem that if the substantial discrepancies between the amounts of income which he reported for the taxable *50 years and the amounts shown by the net worth method could be satisfactorily explained, he would have attempted to do so. Yet he failed to make such explanation, either in the conferences which the revenue agent and the special agent arranged with him for that particular purpose, or during his testimony before this Court. The following statement in the opinion of the Supreme Court in , is particularly pertinent here: "Once the Government has established its case, the defendant remains quiet at his peril." After hearing petitioner testify and observing his demeanor, after considering and weighing all the evidence, and after taking into consideration the principles set forth in the above-cited cases, we are impelled to conclude that petitioner's understatements of income were due to willful intention to conceal income and evade tax. We hold that at least part of the deficiency for each of the taxable years here involved was due to fraud with intent to evade tax; and accordingly, that petitioner is chargeable with an addition to tax for fraud for each of said taxable years, under section 293(b) of the 1939 Code or section 6653(b) of the 1954 Code. 4. The *51 final issue is whether assessment and collection of the deficiency and additions to tax for each of the years involved are barred by the statute of limitations. Section 276(a) of the 1939 Code and section 6501(c)(1) of the 1954 Code, each provides that in the case of a false or fraudulent return with intent to evade tax, the tax may be assessed at any time. What we have said above with respect to the fraud issue is applicable in deciding the present issue also. We hold, in accordance with our ultimate findings of fact, that the return which petitioner filed for each of the taxable years here involved, was false or fraudulent with intent to evade tax; and accordingly, assessment and collection of the deficiency and additions to tax for each of the years involved are not barred by the statute of limitations. Decision will be entered under Rule 50. Footnotes
1. All the liabilities were determined under the 1939 Code, except the deficiency for 1954 and the addition to tax under section 6653(b) which were determined under the 1954 Code.↩
*. The complete returns of the petitioner for the years 1945 through 1948 are not available, because the same were destroyed by the Government as old records; but summary records thereof are retained by the district director of internal revenue, which show the filing of the returns and the amounts of tax assessed and paid thereon.
*. See preceding page for footnote.↩
2. The two latter amounts are the 1952 costs of the dental building and equipment which petitioner reported in his 1952 and 1953 returns for depreciation purposes.↩
*. 1952 through 1954 in U.S. Army. **. Did not work in 1950.↩
3. The petitioner's evidence as to his personal living expenses related only to the three items mentioned above. He presented no evidence whatever as to such obvious items as clothing, dry cleaning, personal effects, expenses of operating his car for personal use, meals taken away from the family home, travel, recreation and vacation. And also he presented no evidence with respect to gifts including those concededly made to some of the members of his family to maintain their accounts in the cooperative bank. On this state of the record, we have concluded that petitioner's evidence is clearly insufficient to establish error in the respondent's determination.